UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__08/19/2020__
```

-------------------------------------------------------------X

MICHAEL E. JONES. M.D., P.C., :
:
            Plaintiff, :
:       19-CV-7972 (VEC)
    -against- :
:       MEMORANDUM
:       OPINION AND ORDER
UNITEDHEALTH GROUP, INCORPORATED; :
UNITED HEALTHCARE SERVICES, INC.; :
OPTUM GROUP, LLC; JOHN DOE ENTITIES 1-:
10, :
:
            Defendants. :

-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Plaintiff Michael E. Jones, M.D., P.C., d/b/a Lexington Plastic Surgeons, LLC

("Plaintiff"), accuses Defendants, which provide health care insurance services, of purposely

denying or delaying payment of Plaintiff's claims for reimbursement because of Plaintiff's status

as an out-of-network medical provider.  According to Plaintiff, that disparate treatment of out-of-

network providers violates the Employee Retirement Income Security Act of 1974 ("ERISA"),

federal antitrust laws, and related state laws.  Because the Complaint largely consists of factually

unsupported and conclusory labels, Defendants' motion to dismiss for failure to state a claim is

granted; Plaintiff is given leave to amend as set forth below.

## I.     BACKGROUND

      Defendants UnitedHealth Group, Incorporated ("UHG"), United Healthcare Services,

Inc. ("UHS"), and Optum Group, LLC ("Optum") (collectively "United Healthcare Defendants"

or "Defendants") provide health care insurance, administration, and benefits, including to

participants in employer-sponsored benefit plans.  Compl. (Dkt. 1) ¶ 8.  UHG allegedly has

approximately 13% of the health insurance market in the United States and 16% of the market in New York City, where Plaintiff maintains a medical practice. *Id.* ¶ 9.

Plaintiff is not a participating medical provider in Defendants' network, which means that Plaintiff "does not have a contract with the United Healthcare Defendants setting forth the terms under which the United Healthcare Defendants will make payment to Plaintiff for services that Plaintiff provides to patients who are covered under plans that the United Healthcare Defendants issue or administer." *Id.* ¶ 13.  In-network providers, *i.e.*, those who have a contract with Defendants, are paid at discounted and negotiated rates. *Id.*  Insureds, according to the complaint, pay higher premiums so they will have coverage for services provided by out-of-network providers. *Id.*  Defendants' insureds are allegedly entitled to payment from Defendants for at least a portion of the cost of services obtained from out-of-network providers. *Id.* ¶ 14.

According to Plaintiff, its practice is to require every patient to "sign a form which provides for the assignment of insurance benefits and rights by the [patient] to the Plaintiff."[1]  *Id.* ¶ 15.  Plaintiff and the insurance provider, including Defendants, then discuss the scope of the patient's insurance coverage and the applicable co-payments and deductibles before the patient undergoes a procedure. *Id.* ¶ 16.  After the procedure, Plaintiff submits a claim form to the insurance provider in order to obtain the benefits owed to the insured. *Id.* ¶ 17.

Prior to 2019, Plaintiff did not object to Defendants' claim-processing procedure. *Id.* ¶ 22.  Sometime around January 1, 2019, however, Defendants allegedly adopted a new protocol that referred claims by out-of-network providers to Optum for processing; that process has allegedly caused "improper delay or denial of claims." *Id.* ¶ 25.

---

[1]     The specific terms of the assignment agreement(s) are not provided in the Complaint.

The Complaint broadly describes five types of allegedly improper delays or denials of Plaintiff's reimbursement claims.  First, Plaintiff alleges that Defendants began reneging on prior settlements concerning disputed claims because Optum began raising new and baseless objections to Plaintiff's documentation.[2]  *Id.* ¶ 26(A).  Second, Defendants allegedly began denying claims based on pretextual discrepancies between the treating physician and the billing physician.  *Id.* ¶ 26(B).  Third, Defendants denied or delayed claims based on Plaintiff's failure to provide necessary medical records—another reason that Plaintiff alleges to be pretextual and "nearly always demonstrably false in light of the actual supporting documentation submitted by the Plaintiff."  *Id.* ¶ 26(C).  Fourth, Plaintiff alleges that Defendants failed to process claims within the timeframes established by Defendants' insurance policies, NY insurance law, and "historical norms."[3]  *Id.* ¶ 26(D).  Fifth, "one or more" Defendants allegedly had a data entry error that prompted an audit of Plaintiff's files and delayed claim processing.  *Id.* ¶ 26(E).

Plaintiff alleges, "[u]pon information and belief," that other, unnamed out-of-network providers were subjected to "some or all of the aforementioned improper claims practices."  *Id.* ¶ 27.  Plaintiff posits that Defendants have been waging a campaign to force out-of-network providers to become in-network providers and to force out-of-network providers to stop competing with in-network providers.  *Id.*  Plaintiff also alleges in conclusory fashion that all Defendants have been aware of the practices at issue and engaged in "concerted and collusive" conduct to harm Plaintiff and other out-of-network providers.

Based on those threadbare insinuations, Plaintiff attempts to plead violations of ERISA, the Sherman Act, N.Y. Insurance Law § 3224-a, breach of contract, unjust enrichment, and

---

[2]     The Complaint does not make clear what those baseless objections were, nor does it articulate any specific facts supporting Plaintiff's claim that Defendants' reasons—whatever they may have been—were baseless.

[3]     The Complaint does not specify what those "historical norms" are or how they were violated.

breach of the implied duty of good faith and fair dealing. For purposes of standing under ERISA, Plaintiff relies on the alleged assignment of rights from its patients who were participants or beneficiaries in Defendants' benefits plans.

## II.    DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "[F]actual content that is 'merely consistent with,' rather than suggestive of, a finding of liability will not support a reasonable inference." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). While a complaint "does not need to contain detailed or elaborate factual allegations," it does need "allegations sufficient to raise an entitlement to relief above the speculative level." *See Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

"The court, in deciding a Rule 12(b)(6) motion to dismiss a complaint, is required to accept all 'well-pleaded factual allegations' in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 679). The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citation omitted); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (giving "no effect to legal conclusions couched as factual allegations"). Allegations premised on "information and belief" must be supported by specific facts and cannot be accepted at face-value. *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 107 (2d Cir. 2019) (rejecting allegation of breach based on "information and belief" and holding that plaintiff "must marshal more than unsubstantiated suspicions to gain entitlement to broad-

ranging discovery"); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."). Rather, "[t]hose magic words will only make otherwise unsupported claims plausible when "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Id.* at 384–85 (citation omitted).

### A.  Plaintiff's ERISA Claims

Counts I and II of the Complaint each assert violations of ERISA based on Defendants' failure to abide by unspecified ERISA plan terms. Compl. ¶¶ 32. Count I claims that Plaintiff's patients (and Plaintiff by assignment) were deprived of benefits due under their insurance plans, and that, as a result, Plaintiff is entitled both legal and equitable remedies under 29 U.S.C. § 1132(a)(1) and (3). *See id.* ¶¶ 32, 35, 43; *see also Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) ("ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a participant or beneficiary of an ERISA-covered benefits plan to bring a civil action to recover benefits due to him under the terms of his plan." (citation omitted)). Count II claims that Defendants' failure to implement the terms of their plans and their allegedly unjustified denials of benefits constituted a breach of fiduciary duty under 29 U.S.C. §1132(a)(2) (cross-referencing 29 U.S.C. § 1109). *See id.* ¶¶ 48–49. Accordingly, both counts hinge on Plaintiff's ability to plead, at a minimum, the existence of plan terms that Defendants breached or failed to implement and a valid assignment of Plaintiff's patients' rights. Plaintiff's ERISA claims fail on both grounds.

In a case quite similar to this one, the Second Circuit rejected an out-of-network doctor's § 1132(a)(1) and (3) claims against UnitedHealth Group for failing to identify "her patients'

plans or the terms of their plans" and to "allege facts making it plausible that United reduced or

denied benefits . . . 'without any basis.'" *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,

798 F.3d 125, 135 (2d Cir. 2015) (citation omitted); *see* Am. Compl. ¶¶ 269, 362–63, *N.Y. State*

*Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 980 F. Supp. 2d 527 (S.D.N.Y. Oct. 31, 2013) (No.

13-CV-1599, Dkt. 12) (out-of-network doctor alleging violations of § 1132(a)(1) and (3) based

on denial of benefits).   Similarly, in *Guerrero v. FJC Sec. Servs. Inc.*, the Second Circuit

affirmed the dismissal of the plaintiff's § 1132(a)(1) and (3) claims because the plaintiff "did not

identify anything in the plans [] that entitled him to a particular benefit he sought to enforce, and

his allegations were so vague that it is impossible to infer which terms, or even which plan, he

might be seeking to enforce."   423 F. App'x 14, 16–17 (2d Cir. 2011); *see also Prof'l*

*Orthopaedic Assocs., PA v. 1199 SEIU Nat'l Benefit Fund*, 697 F. App'x 39, 41 (2d Cir. 2017)

(affirming dismissal of § 1132(a)(1) claim because it "fail[ed] to identify any provision in the

plan documents requiring the Fund to pay [usual, customary and reasonable] rates").

      Here, there are no well-pleaded allegations as to any plan terms that Defendants may

have violated.[4]   The only pertinent allegation is Plaintiff's "information and belief" that "the

United Healthcare Defendants have an obligation pursuant to the UHC Plans and/or applicable

law to not target or 'flag' Plaintiff or any other out-of-network provider for disparate adverse

treatment that is not equally and fairly applied in relation to all in-network providers."   Compl.

¶ 21.   That allegation is defective.   Plaintiff does not allege facts from which the existence of

---

[4]    Courts have identified two documents that set forth plan terms: "(1) the governing plan document, *i.e.*, the trust agreement or contract under which the plan was formed; and (2) the summary plan description ('SPD'), a plain-English summary of plan benefits and obligations that the plan administrator must file with the United States Department of Labor and provide to each participant and beneficiary of the plan."   *Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 286–87 (2d Cir. 2014).   Neither of those documents, as to any of the unidentified plans that might be implicated by the Complaint, is attached to, excerpted, or summarized in the pleading.

such an obligation could be plausibly inferred,[5] and Plaintiff's interpretation of the effect of any

such a term is a legal conclusion that the Court is not required to accept, even at the pleading

stage.  Nor has Plaintiff made any effort to plead any facts showing that the plan terms are

"peculiarly within the possession and control" of Defendants.[6]  *See Schneiderman*, 882 F.3d at

384–85.  According, Plaintiff has not plausibly alleged the existence of an obligation relative to

treatment of out-of-network providers that Defendants have violated.

Moreover, even if the Court were to assume that all of the relevant plans have a term that

forbids Defendants from discriminating against out-of-network providers, Plaintiff has not

plausibly alleged that Defendants did so.  In yet another blatant attempt to evade the plausibility

pleading standard, Plaintiff alleges, "[u]pon information and belief," that "other out-of-network

providers were subjected to some or all of the aforementioned improper claims practices in a

concerted and collusive effort by the United Healthcare Defendants."  Compl. ¶ 27.  Plaintiff has

not pleaded any non-conclusory facts that support such a belief.  It has not identified a single

similarly situated, in-network provider that received better treatment.  Nor has it identified even

one other out-of-network provider that had been subjected to the same treatment as Plaintiff.

Nor can Plaintiff rely on its conclusory allegations that Defendants' adverse determinations of its

---

[5]     Presumably, different UHC plans have different terms.  The complaint also fails to disclose what plans are at issue.

[6]     Indeed, plan administrators are legally obligated to provide plan participants and beneficiaries with plan documents, including plan terms, both periodically and upon request; annual reports are also available through the Department of Labor.  *See* 29 C.F.R. § 2520.104b-1; 29 C.F.R. § 2520.104b-2; 29 C.F.R. § 2520.102-3.  Plaintiff has apparently not made any effort to obtain or request the relevant documents as either an assignee of its patients' rights or through its patients, who are alleged participants or beneficiaries.  Publicly disseminated documents cannot be considered to be in the exclusive possession of Defendants.  While Plaintiff may be correct that it would be unfair to require ERISA beneficiaries to obtain facts that would be solely within the possession of the plan administrator, requiring litigants to plead the plan terms that they believe entitle them to relief, which are available upon request, is not unfair and is entirely appropriate.  *Cf. Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer.").

claims were pretextual.  *See, e.g., id.* ¶ 26(B) (alleging in vague and sweeping terms that Defendants' stated rationales for denial were "nearly always demonstrably false").  Such allegations are indistinguishable from those of the medical provider in *N.Y. State Psychiatric Ass'n*, which alleged in conclusory fashion that UnitedHealth denied claims "without any basis." *See* 798 F.3d at 135.

Even if Plaintiff had adequately pleaded a violation of ERISA, its ERISA claims would still be subject to dismissal if Plaintiff does not have a cause of action under the statute.  The only private litigants entitled to bring a civil enforcement action pursuant to 29 U.S.C. § 1132(a)(1)–(3) are plan participants, beneficiaries, or fiduciaries.  *See* 29 U.S.C. § 1132(a)(1)– (3); *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 177 (2d Cir. 2001).  A "narrow exception" exists for "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care benefits."  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 361 (2d Cir. 2016) (quoting *Simon*, 263 F.3d at 178); *see also Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (distinguishing so-called "ERISA standing" from Article III standing).  That "narrow exception grants standing only to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care."  *Simon*, 263 F.3d at 178 (citation omitted).  Plaintiff's ERISA standing therefore depends on the existence of a valid assignment agreement, which must be evaluated in accordance with contract principles.  *See Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.*, 919 F. Supp. 2d 345, 351 (S.D.N.Y. 2013).

In keeping with the rest of the Complaint, Plaintiff's allegations regarding the assignment of rights from its patients are conclusory.  Plaintiff alleges that it has a general practice of requiring patients to "sign a form which provides for the assignment of insurance benefits and rights . . . .  Under the terms of the . . . Assignment, [the patient] assigns to Plaintiff all benefits

to which [the patient] is entitled under the applicable UHC Plans . . . ."  Compl. ¶ 15.  Nowhere does the Complaint identify a single patient, even anonymously, who executed an assignment agreement and received medical services in exchange, and as to whom Defendants refused or delayed payment.  The actual terms of Plaintiff's assignment agreement are not included in the Complaint—even though the agreement is readily available to Plaintiff—leaving the Court with only Plaintiff's bare legal conclusion as to the validity and effect of any assignment agreement that may have been signed.  *See Am. Psychiatric Ass'n*, 821 F.3d at 361 ("[S]imply asserting that claims under ERISA § 502(a)(3) . . . have been assigned by the patients to Dr. Savulak is insufficient by itself to give Dr. Savulak a cause of action under the statute.").  Nor has Plaintiff alleged that any such assignment was consistent with the terms of the ERISA plans at issue, which could contain an anti-assignment provision or restrictions on the form of any permissible assignment.  *See McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 (2d Cir. 2017) ("Based on the plain language of this [anti-assignment] provision, [the provider's] acceptance of an assignment was ineffective—a legal nullity."); *Neuroaxis*, 919 F. Supp. 2d at 351 ("Assuming a plan does not dictate the form of a valid assignment or bar assignment altogether, a court may draw upon federal common law in assessing whether any purported assignment was effective.").  Because of these deficiencies, Plaintiff has not plausibly pleaded the existence of valid assignments of rights that would enable Plaintiff to assert either of its ERISA claims.

The Court declines to address, at this juncture, whether Count II should be dismissed on the ground that it is not "brought in a representative capacity on behalf of the plan" as a whole.  *See Coan*, 457 F.3d at 259 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)).  Despite Plaintiff's attempt to rewrite the Complaint through its opposition

brief,[7] the breach of fiduciary duty claim, as currently constructed, does not purport to seek any relief on a representative basis.  Nowhere does the Complaint reference any attempt to represent absent parties or to seek relief on behalf of similarly situated persons; the alleged injury is "serious economic damages to the *Plaintiff's* business," and the requested relief is "all compensatory damages, plus interest, costs of suit and legal fees for having to bring this action, appropriate equitable relief, and such further and other relief as the Court deems just and proper."  Compl. at 15 & ¶ 52 (emphasis added).  The Supreme Court, however, has held that the representative capacity requirement articulated in *Russell* may not apply depending on the nature of the plan.  Here, given the state of the Complaint, virtually nothing about the plans that are relevant to this action is known.  *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) ("[T]he 'entire plan' language from *Russell* . . . does not apply to defined contribution plans.") (distinguishing defined benefit plans from defined contribution plans).

For those reasons, Counts I and II are dismissed with leave to amend because Plaintiff may be able to plead the plan term(s) that Defendants allegedly violated, valid assignment(s) of benefits by Plaintiff's patient(s), and either an intent to proceed in a representative capacity or facts that plausibly show the inapplicability of the representative requirement.

## B.  Plaintiff's State Law Claims

Plaintiff asserts five state law claims related to its ERISA claims: violation of N.Y. Insurance Law § 3224-a (Prompt Pay Act) (Count IV), breach of contract (Count V), unjust enrichment (Count VI), breach of the implied covenant of good faith and fair dealing (Count VII), and tortious interference (Count VIII).  Defendants argue that each of the claims should be

---

[7]     As set forth in the Court's Individual Practices, Rule 4(E), Plaintiff could have amended the Complaint as of right in response to the motion to dismiss, which would have resulted in the dismissal of the pending motion to dismiss as moot.  That would have been the proper course of action had Plaintiff wanted to add facts for the Court's review.

dismissed as preempted by ERISA or for failure to state a claim.  The Court agrees that Plaintiff's common law claims are expressly preempted, and that Plaintiff fails to plead a plausible claim for relief under the Prompt Pay Act, even if it is not preempted.

ERISA contains a preemption provision, which expressly "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute.  29 U.S.C. § 1144.  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 114 (2d Cir. 2008) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)).  ERISA preempts state laws that "provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee.'" *Id.* (citation omitted).  ERISA also preempts state common law claims "that seek to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA." *Id.* (citation omitted).  A claim under state law is not independent of ERISA if the terms of a benefit plan are "an essential part" of the claim, and liability would exist only because of the administration of an ERISA-regulated benefit plan. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 213 (2004).

Plaintiff's state law claims are preempted because they are not independent of the terms of the relevant ERISA plans.  "State laws, or actions pursuant to state law, that [are] preempted include: common law tort and contract actions asserting improper processing of a claim for benefits under an ERISA-covered benefit program." *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir. 1989) (citation omitted).  In *Paneccasio*, the Second Circuit disposed wholesale of the plaintiff's claims of "breach of contract, breach of the covenant of good faith and fair

dealing, violation of the Connecticut Unfair Trade Practices Act, reckless misrepresentation, negligent misrepresentation, and tortious interference with contract," because each claim was premised on the denial of benefits alleged to be due under an ERISA plan.  *See* 532 F.3d at 114. The same is true of all of Plaintiff's state common law claims.  Count V alleges that Defendants breached their contracts with Plaintiff's patients by failing to administer and process Plaintiff's claims for benefits, Compl. ¶¶ 73–74; Count VI alleges that Defendants have been unjustly enriched by retaining benefits that should have been paid to Plaintiff or Plaintiff's patients under their plans, Compl. ¶ 83; Count VII alleges that Defendant failed to act in good faith when denying or delaying benefits payments due to Plaintiff under the plans, Compl. ¶¶ 88–90; and Count VIII accuses Optum of interfering with the other Defendants' payment obligations under the benefits plans, Comp. ¶ 97.  In short, none of Plaintiff's state common law claims would exist but for the existence of payment and claim-processing obligations under the ERISA plans, and liability and damages for each claim cannot be ascertained without referring to the plans' coverage and payment terms.  The state common law claims are, therefore, preempted.

As to Count IV, which alleges a lack of prompt payment as required by N.Y. Ins. Law § 3224-a, Plaintiff attempts to invoke ERISA's savings clause, which exempts from preemption "any law of any State which regulates insurance."  *See Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 107 (2d Cir. 2017).  "A law 'regulates insurance' under this savings clause if it (1) is 'specifically directed toward entities engaged in insurance,' and (2) 'substantially affects the risk pooling arrangement between the insurer and the insured.'"  *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 240 (2d Cir. 2014) (quoting *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003)).  The Prompt Pay Act requires health insurance claims to be paid within thirty or forty-five days of receipt, depending on whether the method of transmission is digital or

physical, provided that the obligation to pay is "reasonably clear" and there is no "reasonable

basis" to believe that the claim is fraudulent.  *See* N.Y. Ins. Law § 3224-a(a); *Maimonides Med.*

*Ctr. v. First United Am. Life Ins. Co.*, 116 A.D.3d 207, 209 (2d Dep't 2014).  While Plaintiff

may be correct that that the Prompt Pay Act is aimed at insurance companies, it fails entirely to

explain how the Prompt Pay Act, which does not affect coverage, liability, or access to medical

providers, "substantially affects the risk pooling arrangement between the insurer and the

insured." *Wurtz*, 761 F.3d at 240.  Indeed, notwithstanding the savings clause, district courts in

this circuit have consistently held that the Prompt Pay Act is preempted by ERISA.[8]

Even if the Prompt Pay Act were not preempted by ERISA, the claim would be dismissed

because the Complaint has no well-pleaded allegations plausibly supporting an entitlement to

relief.  Payment deadlines under the Prompt Pay Act are triggered only if the coverage is

"reasonably clear" and the insurer lacks a good faith basis for withholding payment.  *See* N.Y.

Ins. Law § 3224-a (requiring insurer to promptly notify insured in writing the "specific reasons

why it is not liable" in case of "good faith dispute regarding" eligibility or liability).  Here,

Plaintiff has not alleged a single claim that remained pending for more than thirty days after

receipt, nor has it identified any claim that was not paid for which a specific reason for denial

was not provided.  Nor has Plaintiff pleaded any non-conclusory allegations of fact to support an

inference that coverage for any claim was "reasonably clear" or that any delay or denial was

without reasonable basis or in bad faith.[9]  *See* Compl. ¶ 26(B) (claiming that Defendants' reasons

---

[8]      *See, e.g.*, *Bassel v. Aetna Health Ins. Co. of New York*, No. 17-CV-05179, 2018 WL 4288635, at *6
(E.D.N.Y. Sept. 7, 2018) (rejecting savings clause argument); *Neurological Surgery, P.C. v. Siemens Corp.*, No. 17-
CV-3477, 2017 WL 6397737, at *6 (E.D.N.Y. Dec. 12, 2017) (finding express preemption).

[9]      Plaintiff claims that when Defendants were presented with contrary information following a denial,
Defendants directed Plaintiff to an appeals process, at the conclusion of which the claim would be denied for
"another demonstrably false pretextual reason."  Compl. ¶ 26(B).  The Complaint does not make clear what such
additional pretextual reasons were or why such reasons were pretextual; nor does Plaintiff explain why the use of an

for denial were "nearly always demonstrably false" without any supporting allegations as to falsity). Indeed, the Complaint is entirely devoid of factual content as to the timing of submitted claims and Defendants' responses, the nature or amount of such claims, the evidence that purportedly contradicted Defendants' reasons for denying the claim, the number of affected claims or patients, and the array of pretextual reasons that Defendants reportedly offered, all of which are facts that should be readily available to Plaintiff. *See* N.Y. Ins. Law § 3224-a(c)(1) (defining liability on a per-claim basis as opposed to prohibiting a general practice); *cf. Maimonides*, 116 A.D.3d at 209 ("The complaint detailed the service dates and the amount of the bills issued by [the plaintiff-provider] to [the insurer] for each of the patients, and alleged that, despite repeated demands for payment in full, [the insurer] failed to pay the balance owed. [Plaintiff] also alleged that [the insurer] never provided written notice, as required by the Prompt Pay Law, that it was not obligated to pay in full the amounts billed by [the plaintiff] for services furnished to the six patients."). Thus, even if not preempted, Count IV fails to state a plausible claim for relief.[10]

To the extent that Plaintiff seeks to enforce prior settlement agreements entered into with Defendants, *see* Compl. ¶ 26(A), it may be able to plead a breach of contract that is separate from any alleged violation of plan terms or ERISA. The Complaint, however, does not attempt to plead breach of contract based on those agreements, and Plaintiff has not alleged, summarized, or otherwise provided any term of any settlement agreement that it claims to have been breached. *See Comfort Inn Oceanside v. Hertz Corp.*, No. 11-CV-1534, 2011 WL 5238658, at *6

---

appeals process would violate the Prompt Pay Act, the obligations of which are discharged upon either prompt payment or prompt notice of the reasons for non-payment.

[10]    The same is true of Plaintiff's other preempted state law claims, all of which are tied to unspecified terms of the benefits plans and conclusory allegations as to breach.

(E.D.N.Y. Nov. 1, 2011) ("[A] claim on a written contract must either (1) quote relevant contractual language; (2) include a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect." (citation omitted)); *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05-CV-4837, 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) ("The complaint must set forth the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the contract." (citation omitted)).

For the foregoing reasons, Plaintiff's state law claims are preempted and dismissed in their entirety. Because Plaintiff may be able to plead a breach of contract based on Defendants' refusal to make payments pursuant to the parties' settlement agreements, which may create a duty separate from any plan obligations, leave to amend Plaintiff's breach of contract claim is granted.

### C. Plaintiff's Antitrust Claims

Count III alleges that Defendants are engaged in actual or attempted monopolization or conspiracy to monopolize in violation of Section 2 of the Sherman Antitrust Act. *See* 15 U.S.C. § 2 (making it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States"); 15 U.S.C. § 15 (creating private right of action). "To survive a motion to dismiss, a Sherman Act claim must '(1) define the relevant geographic market, (2) allege an antitrust injury, and (3) allege conduct in violation of antitrust laws.'" *See Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). "For antitrust purposes, the concept of market has two components: a product market and a geographic market." *Id*. (quoting *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)).

The allegations specific to Count III largely consist of vague and non-committal invocations of antitrust buzzwords and are insufficient to state an entitlement to relief. *See, e.g.*, Compl. ¶ 55 ("[T]he United Healthcare Defendants collectively, possess monopoly power in the relevant health insurance market."), ¶ 58 ("The United Healthcare Defendants engaged in the aforementioned unlawful predatory conduct with the intent to acquire, maintain, and/or increase their monopoly power."). Plaintiff's antitrust claims fail for lack of antitrust injury and failure to state a claim under Section 2 of the Sherman Act.

### 1. Antitrust Injury

Plaintiff has failed to plead an antitrust injury because it has not plausibly alleged any anticompetitive effect on the health insurance market. "A private plaintiff seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege" that "the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (emphasis in original) (citations omitted). Courts engage in a three-part analysis to determine antitrust standing:

> First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive. Next, we identify the actual injury the plaintiff alleges. This requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct. Finally, we compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (cleaned up). "It is not enough for the actual injury to be 'causally linked' to the asserted violation." *Id.* (citation omitted). Rather, "the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." *Id.* (cleaned up).

Charitably construed, Plaintiff's Sherman Act theory appears to be that Defendants are exercising monopoly power that they hold in the health insurance market by withholding payment to out-of-network providers, which incentivizes more providers to join Defendants' network, which then encourages more people to purchase health insurance from Defendants because of their larger in-network cadre of providers, thereby allowing Defendants to acquire a bigger share of the health insurance market. *See* Compl. ¶ 27. Plaintiff, as an out-of-network provider of medical services, suffers a higher frequency of denied claims and incurs greater administrative costs to comply with burdensome claim procedures that Defendants are able to impose because of their monopoly power.[11]  *See id.*

Even if Defendants are engaged in pressure tactics to compel medical providers to join their network, a fact that is not well-pleaded in the Complaint, Plaintiff has failed to allege that the practice has had an actual or likely adverse effect on competition in the insurance market. *See Gatt*, 711 F.3d at 76. Plaintiff does not allege, for instance, that medical providers have joined Defendants' network as a result of the purported discrimination against out-of-network providers. Nor does it allege that Defendants have expanded their network or their share of the health insurance market since allegedly adopting the complained-of practices on or about

---

[11]      Plaintiff also alleges, in the alternative, that Defendants' discriminatory scheme discourages out-of-network providers from treating patients insured by Defendants, which has the effect of reducing competition against Defendants' in-network providers. Compl. ¶ 27. Assuming the existence of such a scheme, Plaintiff has not plausibly alleged how Defendants could possibly acquire a greater share of the insurance market by discouraging providers from accepting their plans or reducing the level of competition experienced by their in-network providers.

        To the extent that Plaintiff is arguing that in-network medical providers, who are Plaintiff's direct competitors, could acquire a greater share of the healthcare market in New York as a result of Defendants' discrimination against out-of-network providers, Plaintiff cannot state a claim because Defendants cannot monopolize a market in which they do not compete. *See Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 185 (E.D.N.Y. 2006) ("[T]he Second Circuit has held that 'it is axiomatic that a firm cannot monopolize a market in which it does not compete.'" (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998))). Accordingly, the rest of this opinion focuses on whether Plaintiff has alleged monopolistic conduct aimed at the health insurance market, rather than the healthcare market.

January 1, 2019.  *See Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.*, 138 F. Supp. 3d 303,

323 (S.D.N.Y. 2014) (holding that counterclaimant failed to allege antitrust standing because it

"does not allege price increases, competitor exits from the market, or anything else that could

substantiate the injury necessary to have standing to sue under the antitrust laws"), *as amended*

(Apr. 1, 2014).  Indeed, Plaintiff has not even alleged that Defendants' competitors are even

*likely* to be disadvantaged by the practice.  *Cf. Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F.

Supp. 2d 372, 381 (S.D.N.Y. 2007) ("[A] plaintiff 'does not necessarily' need to allege and

'prove an actual lessening of competition in order to recover,' so long as competition is likely to

decrease, although 'the case for relief will be strongest where competition has been

diminished.'" (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14

(1977))).  Defendants' competitors could conceivably be disadvantaged if Defendants use

improper tactics to absorb a dominant share of the providers in a given market and prevent other

insurance companies from contracting with those providers.  But absent any allegation that

network membership is exclusive, providers who join Defendants' network remain available to

join networks operated by Defendants' competitors, who, in any event, could adopt their own

strategies for network expansion.  Providers like Plaintiff must then make a business decision as

to the benefits and costs of joining one or more networks; Plaintiff's dissatisfaction with the

treatment it receives as an out-of-network provider does not, standing alone, state an antitrust

injury.

     Because Plaintiff has not alleged a plausible basis to believe that Defendants' conduct has

had or is likely to have an effect on competition in the insurance market, it has failed to plead the

element of anticompetitive conduct.  Plaintiff, therefore, has failed to plead an antitrust injury necessary to sustain Count III.[12]

### 2.   Monopolization

Plaintiff asserts only a violation of Section 2 of the Sherman Act, which prohibits actual monopolization, attempted monopolization, and conspiracy to monopolize.  To plead monopolization in violation of § 2, a plaintiff must plead facts from which the Court can plausibly infer that the defendant possessed monopoly power in the relevant market and that it willfully acquired or maintained that power.  *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015).  In order to plead attempted monopolization, the plaintiff must plead facts from which the Court can plausibly infer that (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) there is a dangerous probability that the defendant will achieve monopoly power.  *Id.*  Finally, "the offense of conspiracy to monopolize requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).  Plaintiff has failed to meet any of the three standards.

For the reasons already discussed, Plaintiff has failed to plausibly allege that Defendants engaged in predatory or anticompetitive conduct.  Although Plaintiff alleges that it believes that Defendants are targeting out-of-network providers for unfavorable treatment, Plaintiff does not

---

[12]    The Court declines to address whether Plaintiff's injury is of the kind that Section 2 of the Sherman Act is designed to prevent, except to note that, in any amended pleading, Plaintiff must overcome the presumption against antitrust claims filed by parties who are neither competitors nor consumers of the defendant's product.  *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539 (1983) (instructing courts to consider whether plaintiff is "neither a consumer nor a competitor in the market in which trade was restrained"); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481, 2014 WL 4277510, at *18 (S.D.N.Y. Aug. 29, 2014) ("In most antitrust cases, the applicability of the [*Contractors*] factors is relatively straightforward because private plaintiffs are typically either competitors or consumers in the relevant market.").

offer any facts that could support such a belief.  Plaintiff has not identified any similarly situated providers or any in-network comparators, nor has Plaintiff even identified a single insurance claim that was improperly processed or denied, despite sweeping conclusions about an alleged pattern of misconduct.  In other words, Plaintiff appears to be generally dissatisfied with Defendants' claims processing and, without any specific supporting facts, attempts to extrapolate from its own limited experience a wide-ranging scheme to discriminate against out-of-network providers in order to acquire market share, all because Plaintiff happens to be out-of-network and Defendants (according to Plaintiff) happen to have a significant share of the health insurance market.  Thus, even assuming that discrimination against out-of-network providers could constitute anticompetitive conduct, the Complaint engages in mere speculation as to the actual existence of such a practice.  That alone is insufficient to state a claim for actual or attempted monopolization.

Plaintiff has also failed to plead that Defendants possess monopoly power,[13] which is "the power to control prices or exclude competition."  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (citation omitted).  Monopoly or market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."  *Id*.  Plaintiff has not alleged any facts from which the Court can infer that Defendants have market power in the health insurance market, however that is defined.  Plaintiff's theory that Defendants can exclude

---

[13]     Although Plaintiff alleges that Defendants have monopoly power, it fails to adequately allege the relevant market.  While it appears to suggest that there is a "health insurance market," it is entirely unclear what is included within that alleged market.  Does it include employer-sponsored health care plans only where UnitedHealth underwrites the risk?  Does it include employer-sponsored, self-insured plans that are administered by UnitedHealth?  Does it include Medicare Advantage-type plans?  Does it include individual plans purchased on health care exchanges?  Why are "the City, Borough, County, and State of New York" appropriate geographical units for analyzing Defendants' market power?  *See* Compl. ¶ 55.  What share of the market do Defendants control in Manhattan and the State of New York?  The Complaint is of no assistance in answering these questions.

competitors from selling insurance by discriminating against out-of-network providers is a *non-sequitur*. *See id.*  Although the Complaint alleges that the exclusionary practice began on or about January 1, 2019, Plaintiff does not allege that Defendants acquired greater market share since then.[14]  Nor does Plaintiff allege that network affiliations for providers are exclusive; if providers can join multiple insurance networks, then it is unclear how even oppressive methods to attract providers would enhance Defendants' share of the insurance market.

Absent direct evidence, monopoly power can be inferred from a combination of a defendant's large or "predominant" share of the relevant market and other market characteristics. *Id.* (citations omitted).  "[T]he higher [the] market share, the stronger is the inference of monopoly power."  *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981).  "[A] market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."  *Id.*  Market share alone, however, cannot support an inference of monopoly power.  *Tops Markets*, 142 F.3d at 98 ("A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics.").  Because Plaintiff alleges Defendants' market share is approximately 13% nationally and 16% in New York City, which is far short of even a 50% market share, the Complaint must contain exceptionally strong allegations as to other market characteristics that could support a plausible inference of monopoly power.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer

---

[14]     The Complaint alleges that Defendants have an "approximate 13% market share of the health insurance market in the United States, and an approximate 16% market share of the health insurance market in New York City."  Compl. ¶ 9.  It is unknown whether that was Defendants' market share before or after its allegedly anticompetitive scheme commenced.

monopoly power."); *Sandoz*, 813 F. Supp. 2d at 579 ("The 29% market share figure for which Sandoz has provided support is not sufficient to support a claim of actual monopolization."). The Complaint, however, contains nothing but conclusory assertions of monopoly power, foreclosing any plausible claim of actual monopolization under Section 2 of the Sherman Act. *See* Compl. ¶ 55 ("As a direct and proximate result of the aforementioned market share and collusive and/or concerted actions, Defendant UHG individually, and the United Healthcare Defendants collectively, possess monopoly power in the relevant health insurance market.").

Nor has Plaintiff plausibly pleaded attempted monopolization. While "a lesser degree of market power may establish an attempted monopolization claim," *Tops Markets*, 142 F.3d at 100, it is "difficult to establish the dangerous probability element where a defendant holds less than a 40% share of a market, unless other factors indicate the market share figures understate the market power held by the defendant." *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999) (citation omitted). Here, Plaintiff has not pleaded any facts indicating that Defendants wield any more market power than their 13% or 16% market share would suggest, or that Defendants are on the verge of acquiring a much larger share of the health insurance market. *Cf. All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 642 (E.D.N.Y. 2009) (finding a "dangerous probability" of achieving monopoly power based on the defendants' control of approximately 65% of the relevant market).

Claims for attempted monopolization and conspiracy to monopolize require factual allegations from which the Court can plausibly infer that Defendants have a specific intent to monopolize; Plaintiff included no such allegations in the Complaint. *See Volvo*, 857 F.2d at 73– 74. Plaintiff's allegations of intent consist of formulaic recitations of the legal definition and,

therefore, are not well-pleaded.[15]  *See, e.g.*, Compl. ¶ 58 ("The United Healthcare Defendants engaged in the aforementioned unlawful predatory conduct with the intent to acquire, maintain, and/or increase their monopoly power in the relevant health insurance market.").

Finally, "[i]n order to successfully allege [an antitrust] conspiracy, *Twombly* requires that a plaintiff provide 'specific time(s), place(s), or person(s) involved in the alleged conspiracies.'" *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) (citing *Twombly*, 550 U.S. at 565 n.10).  "It is well established that solely pleading opportunities to conspire is not sufficient to support a claim of actual conspiracy." *Id.* (quoting *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993)) (cleaned up).  The only coordinated action alleged in the Complaint is that UHG outsourced the processing of certain claims to Optum, which is not itself indicative of any scheme to engage in anticompetitive conduct.  *See* Compl. ¶ 24.  Beyond that, Plaintiff offers nothing but speculation that Defendants engaged "in a concerted and collusive effort" to monopolize the insurance market.  *See id.* ¶ 27; *Twombly*, 550 U.S. at 557 ("[T]erms like 'conspiracy,' or even 'agreement,' . . . might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." (citation omitted)).

In short, Plaintiff has failed to plead that Defendants possess monopoly power, have a specific intent to monopolize, or have conspired to monopolize the health insurance market.  At its core, this case as currently constructed is about Plaintiff's personal gripe about its treatment

---

[15]      Although allegations of anticompetitive or exclusionary conduct may support an allegation of specific intent, as previously noted, Plaintiff has not pleaded any facts showing that Defendants targeted any other out-of-network provider or excluded Defendants' competitors from the market.  *See Volvo*, 857 F.2d at 74.

by UnitedHealth, which happens to be a large insurer and, for purposes of its Sherman Act claim, not a competitor of Plaintiff.  That is insufficient to state a monopolization claim.  Indeed, UnitedHealth need not deal with Plaintiff at all.  *See In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014) ("In the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of . . . an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."), *as corrected* (June 19, 2014).  Count III is, therefore, dismissed.  While the Court finds it highly unlikely that Plaintiff will be able to plead sufficient facts to support an antitrust injury or an inference of monopoly power, given Defendants' less than 20% share of the alleged relevant market, the Court cannot say, at this stage, that such a pleading would be impossible. Accordingly, Plaintiff is given leave to amend Count III.

## III.   CONCLUSION

For the foregoing reasons, Counts I through III are dismissed with leave to amend; the state law claims are dismissed with prejudice, with the exception of Plaintiff's breach of contract claim, which may be re-pleaded to assert any breach of the parties' settlement agreements, to the extent that such agreements are independent of ERISA plan terms.  Any amended pleading, which must be accompanied by a redlined version to show changes from the Complaint, must be filed by **September 11, 2020**.

The Clerk of Court is respectfully directed to terminate docket entry 27.

**SO ORDERED.**

Date:  **August 19, 2020**                          **VALERIE CAPRONI**
       **New York, New York**                       **United States District Judge**

24